Good morning. We have three argued cases this morning. The first of these is number 2011-1619 ALLERGAN v. SANDOZ. Ms. Maynard. May it please the court. My name is Deanne Maynard and I'm presenting argument on behalf of the ANDA applicant. The district court applied the wrong legal analysis. Under the correct analysis, this is a classic case of all Allergan did was take two widely known glaucoma drugs that were already being used together and put them in a single bottle. DeSantis already provided both the roadmap and the motivation for doing that. Take an alpha 2 agonist, combine it with a beta blocker, preserve it, and use it to more effectively treat glaucoma and to increase patient compliance. Even if we agree with what you've said thus far, the problem that I frankly have is with claim four, the 149, and decreasing the dosage from three to two times a day without loss of efficacy. And it seems to me that the district court made quite a number of findings with respect to the prior art and that this would have been an unexpected result. And I'm finding it hard to see how you can overcome those findings. Okay. I'd be happy to address that, Judge Proctor. The initial matter, all the rest of the patents are claims are obvious for the reason I've just said. And I'll address claim four. And I think it's important when you're looking at claim four divided into two, which is whether we made a prima facie case of obviousness and then whether they came forward and met their burden of production with respect to fixing the afternoon trough question. Well, all of our recent cases, I said there is no burden shifting that goes on. So let's just consider the totality of the evidence as to whether or not the totality of the evidence establishes obviousness or non-obviousness. I certainly, Your Honor, wouldn't want to take issue with you with respect to the burden shifting. But as I understood the court's precedent, including encyclopendaprene, there was still burden of production with respect to coming forth with the evidence on unexpected results. But just look at it in its totality. A person of skill in the art would have expected a reduction in the dosage of bramonidine by combining these drugs in a single bottle for several reasons. DeSantis itself said to expect a surprising increase in efficacy when you combine a beta blocker together with an alpha-2 agonist. And then studies showed that when previous drugs had been combined together, including especially with temelol, that there was allowed then to be a decrease in the overall dosage. And two of the studies to which we point in our brief, Kleinschmidt and Erickson, show that. That when, in particular, pilocarpine was put together with temelol, there was the ability to reduce the overall dosage of pilocarpine without loss in efficacy. But that's a different drug. So what is there in the record explicitly? I mean, the district court has a lot of findings in his opinion. And it goes to the testimony of the experts. It goes to going through every study you put forward. So what's the top of your list in terms of what facts are in the record that can establish that they knew that it was not an unexpected result? Well, the facts are that physicians in the United States and abroad, and it was approved abroad, were using bromonidine two times a day already as a monotherapy. And that it was effective as a monotherapy. And then when drugs were combined, the second thing is that with unexpected results, it's important to make the right legal comparison. And the district court, throughout its analysis, was making the wrong comparison. And Allergan continues to make it here. So the right comparison under the law is to the closest prior art. The closest prior art with respect to this combination drug, which is given two times a day, would be the serial treatment of two times a day bromonidine and two times a day Temelol. Is the question of what is the closest prior art a factual question or a legal question? I think that the question of what is the closest prior art is probably a legal question, Your Honor. Because this court can look at the factual question, and if the district court found otherwise here, it would be clearly erroneous fact finding. Because here, what you're talking about, what they're trying to compare it to is they're saying, they say, well, when you take bromonidine two times by itself, you get this dip in the afternoon, and it's efficacy. But if you take bromonidine three times in the afternoon, you don't get that dip. And I guess I'm still struggling with the issue of the district court's findings, and the district court was very specific with respect to its findings as it relates to the prior art and what was the closest prior art, and the meaning of, I assume you're talking about Larson? Yes, Your Honor. Well, Larson shows that, well, there are multiple references, actually, that show that Temelol was being given two times a day with bromonidine two times a day. So the fact that that was out there in the world, Stuart, which is a retrospective study, studied patients that were doing that. This was happening in the real world. And I think that one of the reasons the district court's analysis here is flawed is because it's so focused on FDA approval. And I appreciate the point you make with regard to FDA approval, but even with the two dosages, do we ignore the fact the claim for not only says you take it two rather than three times a day, but it says without a loss of efficacy. So even if in the prior art you're using it twice a day serially, how does that get you over the hurdle that the unexpected result was that not just you used it two rather than three, but without a loss of efficacy? Well, with respect to what they claimed in the patent office to get that granted and the loss of efficacy, they didn't point to any afternoon trough. They pointed to an increase in efficacy at hours zero and hours two. And that's what the prior art shows. The prior art shows that they fault Kleinschmidt and they fault Erickson because it only looks at hours zero and two. But the 19T study that they used to get this claim granted showing an increase in efficacy only looked at hours zero and two. It's only now after the fact that they're coming in and pointing to hour nine. And the supreme reference to hour nine in the spec or am I? No, you say there's no reference to anything other than zero, two in the specification. Well, the example does talk about example two in the specification, Your Honor, is not the 19T study. Example two in the specification is the 13T study. But to get this granted, they used the 19T study. And that's cleared in part from looking at page A8350 in the record. A8350 shows the amendments including 57 which became claim four is on A8349. The study that they're talking about here on the right at A8350 is not example two in the specification. It's the 19T study. And the 19T study only looked at hours zero and two. And so to come back now, I mean, I think the Supreme Court has indicated that you ought not to be able to point to after the fact not provided to the patent office evidence for unexpected results. In John Deere, the court rejected reliance on a flexing quality there because the flexing quality had not been pointed out to the patent office. So I think as a matter of law, one could say it's improper to look at this new claimed unexpected result, this supposed six of the afternoon trough now in any event, because it isn't what they pointed out to the patent office. They're relying on hours zero and two. And the studies in the record show that the efficacy of bromonidine, there's two different... It starts to sound like an enablement problem, isn't it? I mean, are you saying that the scope of the claim isn't enabled? I mean, the claim says three to two without loss of efficacy. No, Your Honor. Are you saying now that they haven't accurately described or enabled that in the claim by just pointing to that study? No, Your Honor. What I'm arguing is that it would have been... A person of skill in the art would have believed from what was known in the art that combining these two things together in a single drug would have allowed you to reduce from three times bromidine to two times bromidine. What you're saying is it would have achieved the objectives that are described in the patent. Yes, Your Honor. And what you're saying is that the afternoon trough was not an objective, elimination of the afternoon trough was not an objective of the patent, so they can't rely on that for unexpected results. Exactly, Your Honor. And the Supreme Court said that in John Deere. And then they fault our prior art, as did the district court, for not looking at the key time point, the afternoon trough. But the prior art does show a reduction in efficacy at hours zero and two. Even they had done studies about shifting from bromidine. So both the Rosenthal reference and the Walters reference are their own studies, Allergan's own studies on the efficacy, comparing the efficacy of three times bromidine by itself to two times bromidine by itself. And in those studies, they concluded that there was no loss of efficacy. Now, and the district court faulted those studies and Allergan faults them now because they don't talk about the afternoon trough. But that's not the issue. Well, you say it's not the issue, but it seems to me that there's, and this comes from the findings of the district court and from other stuff in the record, that the notion of going from three to two without a loss of efficacy was generally known to be problematic because of this afternoon trough. They didn't just make this afternoon trough up for purposes of obligation. This was something that was all over the place and generally known, was it not? It was only as it relates to FDA approval, Your Honor. And that's where the court improperly looked to FDA approval. Nothing about the FDA approval standards turn on whether a person of skill in the art would be motivated to invent a drug. Bromidine was approved elsewhere in the world already at two times a day. Physicians, including their own experts, were prescribing it here in the United States to their patients. You put so much weight on this FDA approval thing, but it seems to me like that you completely overstate the district court's reliance on it. I mean, the district court said that, obviously, the absence of FDA approval goes to the question of skepticism. I mean, the district court did not say FDA approval was determinative. And you essentially almost argue that that was the only basis for the district court's decision. I think by overstating your point, I think that it really waters it down dramatically. Well, Your Honor, the district court looked at FDA approval in multiple places of its analysis. It concluded that because the FDA doesn't consider patient compliance, a person of skill in the art wouldn't be motivated to invent a drug that patients were more likely to comply with. Yet even the inventor said that's huge patient compliance. It discounted the existence of six combination drugs because they weren't approved in the United States. This is at A129. It found a lack of expectation of success here simply because the FDA wouldn't approve bromidine. It didn't find it simply because of that. That was just one factor. Isn't that so? That's very different than your arguments, which say that the only factor the court looked to was the FDA approval. That's the problem with your arguments, is that the court said it was a factor, and it's hard to say that it wouldn't be at least a relevant factor. It may not carry a lot of weight, and the district court actually said it doesn't carry substantial weight, but it carries some weight. I grant your argument, Your Honor, that it might have some relevance in the sense that Allergan argues it might have relevance, which is perhaps it would indicate what persons of skill in the art would think about what might work. I do think it's right to say here, which is a legal question, that the district court placed way too much reliance on that factor, and it did sort of bleed through all of its analysis. In fact, it is the linchpin, I think, of this three times a day bromidine because it was only the FDA that was concerned about the afternoon trough, and doctors here were prescribing it off-label at two times a day in the real world despite the FDA. And so to say, well, this is an unexpected result that you can reduce from three times a day bromidine to two times a day from bromidine by combining with Temelol in a bottle, it did, in fact, it was part of a legal error that the district court made that undermined any factual findings that you think it made on this point. Do you want to save your rebuttal time? We'll give you three minutes. Thank you, sir. Thank you. May it please the court. I'd like to start where the court left off in questioning about the without loss of efficacy. First, is Ms. Maynard correct that you can't rely on an unexpected property which isn't included in the patent specification? I don't believe that is correct, Your Honor. I think the null case stands for the fact that you can rely on unexpected results that only become known after the patent sometimes has even issued. In recycled benzaprine also makes that same point, Your Honor, and so does the genetics case. All three of them say that you can't necessarily know what all the results are going to be of the invention until after the invention has actually been out on the market for some period of time and you can then learn what those results are and some of them turn out to be unexpected. Let's assume here that there's a motivation to combine the Temelol on the two times a day dose of bromidine in terms of convenience, pace, and compliance and all that. And what then becomes the relevance of some other property that's not relied on as a motivation to make the combination? We have some recent cases that suggest that if you're not relying on the property in connection with the obvious analysis as a source of the motivation, that it's not relevant. So in this, I will take the court's assumptions as you request me to do, but that still does not deal then with Claim 4 of the 149 patent. Well, I guess it does if she's correct that the efficacy requirement isn't being relied on as a motivation to combine, that patient compliance and convenience is the motivation to combine. In other words, this was done before in a seriatim dosage and there's a motivation to combine them in a single bottle because it's for patient compliance and ease of use and all that. And you're coming back, as I understand it, in Claim 4 and saying, well, that may be true or even assuming that that's true, but you still have this unexpected benefit of combining, which is the elimination of the aftermath drug. Am I understanding correctly? Yes, Your Honor, in part. However, in addition to that, these existed and what appellants are relying on is the fact that vermonidine existed as a monotherapy, Timolol existed as a monotherapy, and that they were being prescribed conjunctively or adjunctively. The problem is that vermonidine as a monotherapy had to be dosed three times a day. No, I think there's evidence in the record that before it was being prescribed for seriatim use two times a day together with the Timolol. That was only off-label and there's no showing in the prior... But let's assume for a moment that I'm correct about that. I understand you don't agree with it, but let's assume that that's correct, that there was this combination before that was part of the prior art and what was achieved here was putting them in a single bottle, that there was a motivation to put them in a single bottle because of ease of compliance and ease of use and patient compliance, and that provided a motivation to combine. Why isn't that sufficient to create a showing of obviousness even with respect to Claim 4? Because the motivation to combine your honor into a single bottle is only part of Claim 4. The other part is to reduce the dosing for three times a day to two times a day without loss of efficacy. And what the court construed pursuant to appellant's request, construed without loss of efficacy to be, is without a decrease in the reduction of interocular pressure. There's nothing in the prior art to show that twice a day dosing of vermonidine did not result in a decrease of the double negative, did not result in a lesser lowering, I should say, of interocular pressure. And in fact, there is prior art to show that it did result in lesser lowering of interocular pressure. Yeah, but don't you have a situation where the production of the afternoon trough, once you combine them, assuming you have other motivations to combine them, is just an inherent property of the combination. No, your honor, there was no reason to believe that at all. That's what I'm suggesting is you don't have to have a reason to believe that. If there's a motivation to combine the two of them, which is adequate and would cause someone to do it, the fact that it has an additional unexpected benefit may not be relevant. But the motivation to combine has to be coupled with a reasonable expectation of success. There's a reasonable expectation of success that it would achieve increased patient compliance. But in addition to that, you have a reasonable expectation of success that you're going to be able to reduce it from three doses to two doses a day without loss of efficacy. There was no expectation that that was going to be able to be achieved. And in fact, all of the data would indicate in the prior art that they weren't going to be able to achieve that. And that's why it came as such a huge surprise to the industry, to the company, to everyone, when indeed they were able to achieve that and received FDA approval. And so that's the key, is that there was nothing in the prior art that gave the formulators, in this case, or one is skilled in the art, a reasonable expectation of success of being able to reduce the dosage from three times a day to two times a day without loss of efficacy. You seem to be backing off of what I thought was somewhat of a surprising argument, which is that patient compliance is not relevant to motivation to combine. So do I understand you're conceding that at least as it relates to motivation to combine, if you put aside the without loss of efficacy limitation, that patient compliance is relevant at least to that motivation? Certainly. And that is one of the reasons why one tries to reduce the number of doses, for example. And one of the reasons why Allergan tried to get bromonidine approved as a twice-a-day versus a three-times-a-day drug and was never successful in doing so, because simply reducing the number of doses, let alone a fixed combination, increases patient compliance. But does that then draw a very stark distinction between Claim 4 and the remainder of the claims that are at issue here, which are broader and don't have the without loss of efficacy limitation? It doesn't, Your Honor. And the reason why is while Claim 4 is definitely the narrowest and has the without loss of efficacy limitation and reducing from three to two, there are other claims. For example, the 976 requires that it be dosed twice a day. So while it doesn't talk about reducing from three to two, it does require, and I'll get my claim sheet here, it does require that it be dosed twice a day and that it be therapeutically effective. And in addition to that, there are claims in the other two patents that while there are claims that are simply a combination of the two, there are other claims which are article claims that specifically say that it's useful for the treatment of glaucoma, and that is dosed twice a day. So we still have that in there. Not quite as clear and not quite as narrow. Thank you, Mr. Scheer. Can I just ask a practical question so I can understand this? Yes, Your Honor. If you prevail on Claim 4, does anything else matter in terms of this drug? No, it does not, Your Honor. The injunction would then remain in place. It's only one claim that would be at issue. But I would simply attempt to answer your question. What about the last six months on the 463 patents? Their expiration dates don't seem to match up. On the 463 patent, Your Honor? Yes. The Orange Book has it expiring in January of 2023, as opposed to all the other patents which expire in April of 2022. I apologize, Your Honor. I wasn't aware of that, and I can't really address why that is. There may have been some form of an extension. But that aside, as Judge Crote pointed out, if the 149 patent is found valid and infringed, then there's still an injunction that would be in place. But Paragraph 4 is then wrong. I really don't know on that one, Your Honor, and I apologize. I did not notice the difference between the expiration dates of the patents. Okay. Can I go back? And this is clearly just a restatement, I think, of what Judge Dyke was saying. But I'm still, I guess, not satisfied that I appreciate the answer. Let's assume for a moment, hypothetically, that we agree with Ms. Maynard, and we think that all claims other than Claim 4 are obvious. Let's also assume that that includes that twice-a-day dosage was in the prior art. So we think all you're left with is the loss of efficacy limitation in Claim 4. Why is that not an inherent property or product that sort of goes along in terms of being insufficient when we start looking at this in terms of an inherency analysis? Because, Your Honor, there was nothing in the prior art, and there's nothing to this day that would show that that was inherent. In fact, it was just— But do you need, for inherency, do you need a recognition that it's there? I mean, I thought that was kind of almost the opposite of inherency, right? That it's there, it exists. And therefore, it doesn't come under the rubric of unexpected result or, you know— Really, you're not going to dispute that it exists, right? It is an inherent property if you combine the two of them, that it eliminates the inherent fraud, right? Well, that apparently happened, but we can't explain why. Well, so, but it's there. I mean, and the fact that you've identified that property doesn't seem to render it non-obvious if the combination would automatically produce that. In other words, you can't get a patent by claiming an inherent property that hadn't previously been identified. But we don't know that the combination would automatically produce it. We're sort of, we're doing a hindsight analysis, and we're saying that, all right— I don't understand what you're saying. I mean, that's the point of your patent is that, or your argument anyway, is that by making the combination, you eliminate the afternoon fraud. So it is an inherent property of the combination, no? That's hard to say, Your Honor, since there's been no studies done as to what occurred that caused it to remove that— Well, who cares what caused it? It happens, right? But then you're saying there is no such thing as, if something's an unexpected result, then it turns out that it must have been inherent to start with, or you wouldn't have had the result. And I'm not sure how we correlate those two. But, well, what I'm suggesting to you is that these recent cases, for example, Santeros, suggest that if the combination would be made for other reasons, and it's not obvious for other reasons, that you can't take it out of being obvious by identifying some other property that results from the combination, which had nothing to do with the motivation to combine. I see what Your Honor's saying, but I just don't think it's applicable in this case, because Claim 4, the 149, that motivation was to reduce from three times a day to two times a day, not just to combine in one bottle, but to actually do a dose reduction. But there seems to have been an adequate motivation to do that based on patient compliance and ease of use. And at least assume that for the moment, that there is a motivation to combine them in a single bottle to eliminate the serine therapy that existed before, and to combine them in a single bottle for ease of use. And lo and behold, by making the combination, it eliminates the afternoon trough. But what I'm saying is that nobody's relying on the elimination of the afternoon trough as a reason, as a motivation to combine them. It's just a byproduct. And the question is whether a byproduct like that can take it out from being obvious when it otherwise would be obvious. It's an interesting question. I'm not sure that any of our cases have resolved that. And I don't know the answer either, Your Honor, because what I'm, in my mind, what I'm doing is sort of a circular argument then, which is, so if you end up with an unexpected result, that nothing taught you was going to happen, then it must have been inherent in your invention, because otherwise you wouldn't have gotten the result. And so if an unexpected result automatically means that it must have been inherent, then you can't have unexpected results, because then your patent's obvious because of inherency. So I'm not sure how to deal with those two. But just if I could, very briefly, before my time is up, address, because we're making certain assumptions here that I'm not quite willing to, I mean, I will if we're to ask you. We'll give you a couple more minutes. What I'd like to address, though, is we're sort of jumping to, it was, you know, motivation to combine, put these two for patient compliance into the same bottle. What we're ignoring, and what distinguishes this case from the Merck case, from the Pfizer case, is we're talking here about two different actives that are very different, and that the appellant's expert admitted could have very different properties, one of which would then have an actual negative effect on the other. We have two different salts. The appellant's expert admitted that when you have these two different salts, you could have very unpredictable and very, once again, negative results. In addition to that, and a really critical one, is we had two different pHs. One was at a 6.3. One was at a 7.0. Those salts in the pHs aren't claimed, right? They aren't claimed, Your Honor. However, they go directly to whether, not just whether there was a motivation to combine, but whether there was a reasonable expectation of success in that motivation to combine. And here, one in skill and the art would know this. Two different actives that were not chemically compatible. Two different salts that were not chemically compatible. Two different pHs with a five-fold difference. And the pH has a significant effect, especially in ophthalmics, where you've got the issue of bioavailability of the active, in addition to the possibility of the active falling out of solution at a higher pH. In this case, the bromonidine, which was formulated at a lower pH. You have two different buffer systems, one of which was alkaline, one of which was acid. And the most important is you have the two different dosing, one of which was three times a day, one of which was two times a day. Before your time runs out, I appreciate that you're anxious to put the book, but we've read the briefs, believe me. I think we have your argument. Can I ask you just a little off question, which is that the patent itself, the disclosure in the patent, is for a specific formulation that seems to me to arguably be narrower than what's claimed in Claim 4, which is the 0.2 and the 0.5. Is that correct? And if so, if someone were practicing the invention, which take aside, it's not practical under the FDA regime, is there a possibility of practicing the 0.2 and the 0.5 and not achieving the result of a loss of efficacy? Because you've only identified one specific formulation in the spec, and it seems to me the claims are broader. Am I missing something here? Well, the claims certainly don't have the specific excipients, for example. They don't cover that, although there are claims that cover use of BAK and a certain amount of the BAK as a preservative. But if Your Honor is asking, could one do a formulation using the 0.2% bromonidine and the, I can't remember what it was. 0.5. 0.5, thank you, of the Timolol in a fixed combination and do something with the formulation such that it might not achieve that getting rid of the trough, that is a possibility. We don't know because... So your claim, Claim 4 at least, let's assume hypothetically that that's the only one that stands in the patent. So Claim 4 would not cover that as a matter of infringement. The infringement of Claim 4 would require... Absolutely. And in fact, I'm glad Your Honor brought that up because appellants argued as to Claims 1 through 3 of the 149 patent, that was a comparison claim where the fixed combination had to be without loss of efficacy or as effective as what the adjunctive therapy is how the court construed it. And appellants argued it's not. If you look, there is one time point where the lowering of interlock ocular pressure is not as good with Combigan as it was with the adjunctive of bromonidine and timolol. And the court agreed and found they did not infringe Claims 1 through 3. So if in fact, the generics could show that they have a formulation that is with a loss of efficacy that combines the bromonidine and the timolol in a fixed combination, they don't infringe Claim 4 of the 149. And I think I'm out of time. If the court has no more questions. Thank you very much. Just a couple of quick points. That last point, Judge Frost, is important to the appellants then for the court to discern which of the patents, if it's going to draw lines between which are obvious and are not. It does matter. And the dates, they do expire on different dates. So, but the evidence that is in the record. But it is true, though, that injunction would stay in place at least until 2022 if the Paragraph 4 can't stand, right? If there's even one claim that's valid and infringed, correct? There's no reason for us to be discussing all of the other claims except to provide some kind of advisory opinion, right? The injunction could last to the length of the patent that is valid. Yes, 2022. Assuming that we were not able to design around or revise our label around it. That's right. Can you respond to the point that your friend on the other side has made, which is that, and in your brief, you constantly just say motivation to combine, motivation to combine. You might want a patient might be more likely to take a product twice a day than three times a day. Or a patient could take it once a day. But if there's no reasonable likelihood of success as to the absence of a loss of efficacy, then you haven't answered the full question about motivation to combine, have you? Well, DeSantis actually has two motivations to combine. The one that Your Honor notes, which is patient compliance. But then it also notes a surprising increase in efficacy when the two drugs are combined together in the same bottle. So, DeSantis itself provides the motivation to combine that increased the loss of efficacy. And then to the extent there is evidence in the record about the effects of a BID, BID, serial treatment two times a day, two times a day, serial treatment comparison to the combination. It is the 507T study. Now, granted that study was done after. It's not prior art. But it studies the prior art of the serial administration. And it shows that the concurrent two times a day treatment already solved the problem. Now, it's only at hour zero and two. And it doesn't cover hour nine. But a person of skill in the art should have a reasonable chance of success at solving this unexpected result of the afternoon trough, even if they're allowed to, under the Supreme Court's precedent, point to that here, even though that's not what they claim to the patent office. If there are no further questions. Okay. Thank you. Thank you. I thank both counsel. The case is submitted.